HAVERBUSH v POWELSON

Docket No. 172033. Submitted February 13, 1996, at Grand Rapids. Decided June 14, 1996, at 9:20 A.M. Leave to appeal sought.

Thomas J. Haverbush brought an action in the Gratiot Circuit Court against Helen L. Powelson, seeking damages and injunctive relief on the basis of the defendant's alleged intentional infliction of emotional distress. The proofs at trial showed that over a two-year period the defendant had written a number of letters to the plaintiff, the plaintiff's daughter, and the plaintiff's future in-laws in which she had called him a compulsive liar, had threatened his fiancee with physical harm, had threatened to move in with him on the eve of his marriage, and had threatened to tell the plaintiff's colleagues that he had harassed her. The proofs also showed that she had left an ax and a hatchet on the plaintiff's vehicles after having asked him how his fiancee would like an ax through her windshield, had left lingerie on the plaintiff's vehicles and at his house, and had told a co-worker on several occasions that someone should "ice" the plaintiff. The court, Jeffrey L. Martlew, J., sitting as the finder of fact, ruled in favor of the plaintiff, awarded him damages, and entered an injunctive order requiring the defendant, a nurse in the unit of the Gratiot Community Hospital to which most of the patients of the plaintiff, an orthopedic surgeon, were sent, to seek a lateral transfer to a similar position in some other unit of the hospital. Following denial of her motions for a new trial and for a judgment notwithstanding the verdict, the defendant appealed.

The Court of Appeals held:

1. The tort of intentional infliction of emotional distress has four elements: extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress. The trial court, as trier of fact, could rationally find that the defendant's behavior was so outrageous in character and so extreme in degree as to be beyond all bounds of common decency and, thus, could properly conclude that the plaintiff had established the first element of the tort.

2. The record establishes that the plaintiff was fearful of the defendant because of the ax and the hatchet that were left on his vehicles, was concerned that the plaintiff would interfere with his wedding, was worried about his reputation because of the plain-

tiff's statements to others, was concerned with his patients' safety, and found his work was affected by the plaintiff's actions. Accordingly, the plaintiff established that he had suffered severe emotional distress. The seeking of medical treatment is not a necessary condition precedent to satisfying the element of severe emotional distress.

3. The trial court did not err in denying the defendant's motions for a new trial and for a judgment notwithstanding the verdict. The record clearly established that the trial court was aware of and applied the proper legal standard and the proper standard of proof with respect to each element and that there was sufficient evidence supporting the court's finding with respect to each element.

4. The trial court properly granted injunctive relief, because it properly concluded that there was no adequate remedy at law. Because the injunctive order merely required that the defendant apply for a transfer to an equivalent position in another unit of the hospital and there was no support in the record for the assertion that the injunction impaired the defendant's ability to carry on her occupation, any concerns about the enforcement of the injunction were misplaced.

5. The trial court properly considered the attorney fees incurred by the plaintiff as a measure of the damages to be awarded. Because the proofs would justify a larger award than that actually awarded and the award was within the range of awards that have been found to be proper in similar circumstances, the award of damages in this case was proper.

6. Although none of the issues raised on appeal were meritorious, the appeal was not so lacking in merit as to be vexatious and to warrant the imposition of sanctions pursuant to MCR 7.216(C).

Affirmed.

1. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — ELEMENTS.

The elements of the tort of intentional infliction of emotional distress are extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress; liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

2. INJUNCTIONS — PREREQUISITES.

There are three prerequisites to obtaining injunctive relief: justice must require that the court grant the injunction, there must be no adequate remedy at law, and there must be a real and imminent danger of irreparable injury.

*Joseph, Wolf, Endean & Stahle, P.C.* (by *Frederick C. Overdier*), for the plaintiff.

*Joanne Vallarelli,* for the defendant.

Before: HOEKSTRA, P.J., and SAAD and S.J. LATREILLE,* JJ

PER CURIAM. In this action for intentional infliction of emotional distress, the trial court, sitting as finder of fact, found in favor of plaintiff and awarded him damages of $11,615. The trial court also issued a permanent injunction forbidding defendant from contacting or harassing plaintiff and requiring defendant to apply for a lateral transfer at the parties' place of employment. Defendant now appeals as of right, and we affirm.

Plaintiff Thomas Haverbush is an orthopedic surgeon who since 1974 has conducted about sixty percent of his practice at Gratiot Community Hospital in Alma, Michigan. Defendant Helen Powelson is a registered nurse who has worked at the same hospital for eighteen years. The parties became acquainted in 1988, when Haverbush treated Powelson's son and Powelson spoke to Haverbush about where her son might obtain a scholarship. Shortly after this, Powelson started giving gifts, such as cookies and wreaths, to Haverbush. However, Haverbush never asked Powelson out on a date and never expressed any romantic interest toward her, and, in fact, Haverbush declined her invitation to go out for coffee.

In August 1989, Powelson learned that Haverbush was dating Cathy Hampton, who also worked at the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

hospital. Powelson mentioned to one of her supervisors that she had a relationship with Haverbush, and the supervisor told her that she was dwelling too much on Haverbush and that it was interfering with her work. In the spring of 1990, Powelson wrote a letter to Haverbush, in which she told him to "f— off," because his behavior was misleading in that he was sometimes overly friendly at work. Powelson sent Haverbush another letter in June 1990, telling him that she dearly loved him. Powelson complained to her union representative that the situation was not good with herself, Haverbush, and Haverbush's girlfriend all working at the same hospital. In August, 1990, Powelson and her attorney met with Haverbush, and Haverbush made clear that he wanted no further contact or communications from Powelson.

According to Powelson, shortly after this meeting, she began receiving nuisance hang-up telephone calls that she believed were instituted by Haverbush. She therefore began writing a new series of letters to Haverbush. She also began placing her lingerie on his vehicle and outside his home. In the spring of 1991, she left a G-string and a garter belt attached to two garden rakes at his home; she left other lingerie at other times. She then wrote a letter to Haverbush complaining about Hampton driving by Powelson's apartment: "I wonder how smart she would have thought she was if an ax went through her windshield. She might think twice about chasing people with her car." Powelson also complained to Haverbush that Hampton was staring at her, stating, "one of these times I may just pull her hair off." About three months later, Powelson claimed that Hampton tried to run her down with a car. Powelson

then left an ax on Haverbush's car windshield. One week later, she left a hatchet on his car. Powelson admitted at trial that, when questioned by police about these incidents, she denied involvement, but that she had, in fact, left both the ax and the hatchet on Haverbush's cars and that she intended him to connect the ax with the reference she had made in her letter to Haverbush about Hampton.

Phyllis Fox, a nurse at the hospital, testified that in the spring of 1991 Powelson told her about a meeting she had with Haverbush and someone from the hospital's administration and that the meeting upset her. Fox testified that on several occasions during this conversation, Powelson said "someone should ice" Haverbush, and "who knows what goes bang in the night."

Powelson also admitted sending a letter to Hampton's parents (whom she did not know) stating that Haverbush was a compulsive liar, that she was sure someday he would get "his balls rearranged," and that he went "around" with many women and girls. She admitted sending a letter to Haverbush's daughter, stating that Haverbush was a chronic compulsive liar, that he put Powelson down, and that he must have done the same thing to the daughter's mother. Powelson concluded the letter by stating, "tell him in whatever language he understands to take a flying leap, fall off the face of the earth, take a hike, take a leap or just drop dead."

Between April 5 and May 4, 1992, Powelson sent Haverbush six letters, knowing that he was engaged to marry Hampton. In her April 16, 1992, letter, she complained that Haverbush continued to make hang-up telephone calls to her, yet she also stated: "I love

you dearly, and sexually you turn me on. I'm sure I would give you the most pleasurable experience in your life, but you can't do it over the phone." On April 25, 1992, she wrote Haverbush giving him notice that she was going to move into his residence and stating that she was prepared to go public with the information she had, starting with his colleagues. On April 30, 1992, she wrote stating that she had just about everything packed. On May 3, 1992, she wrote stating that this was his last chance to change his mind and to leave her a key. On May 4, 1992, she wrote stating that she had no alternative other than to carry out her promise to make public his activities against her.

Because of the placement of the ax and the hatchet on his vehicles, the comments made to Fox, and the letters received in April and May, 1992, Haverbush feared for his safety and met with a police officer to ask what he could do to prevent being shot. He filed suit against Powelson, and a temporary restraining order was issued on June 8, 1992. He also hired two off-duty police officers to provide security to his home and the church when he got married in June, 1992.

After a full trial, the court, sitting as finder of fact, found in favor of Haverbush with respect to his claim of intentional infliction of emotional distress. The court issued an injunction and awarded him $11,615 in damages. Powelson raises several issues on appeal.

I

Powelson first asserts that the trial court erred in finding liability for intentional infliction of emotional distress because Haverbush did not prove all the elements of the tort. The tort of intentional infliction of

emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Roberts v Auto-Owners Ins Co,* 422 Mich 594, 602; 374 NW2d 905 (1985); *Johnson v Wayne Co,* 213 Mich App 143, 161; 540 NW2d 66 (1995). Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* at 161.

Powelson claims that her conduct was not "extreme and outrageous." We disagree; a rational trier of fact could find that Powelson's conduct was so outrageous in character and so extreme in degree that it went beyond all bounds of common decency in a civilized society. She engaged in an escalating series of acts over a two-year period in which she: (1) sent a barrage of letters to Haverbush, to his daughter, and to his future in-laws, in which she called him a compulsive liar, threatened his fiancee with physical harm, and threatened to tell his colleagues that he had harassed Powelson; (2) left lingerie on Haverbush's vehicles and at his residence several times; (3) left an ax and a hatchet on his vehicles, after having asked him how his fiancee would like to have an ax through her windshield; (4) told a co-worker several times that someone should "ice" Haverbush; and (5) wrote several letters threatening to move in with him even though he was engaged and would soon be married. This conduct could appropriately be determined sufficiently extreme and outra-

geous to justify recovery for intentional infliction of emotional distress.

Powelson next argues that Haverbush failed to prove that he in fact suffered "severe emotional distress." 1 Restatement Torts, 2d, § 46, Comment j, p 77, states that emotional distress "includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.." However: the comment continues:

> The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. [*Id.* at 77-78.]

See also *Dickerson v Nichols*, 161 Mich App 103, 107; 409 NW2d 741 (1987). In *McCahill v Commercial Union Ins Co*, 179 Mich App 761, 771; 446 NW2d 579 (1989), we stated that seeking medical treatment is not a condition precedent to satisfying the element of severe emotional distress.

Here, Haverbush presented no evidence that he had sought medical treatment, although he testified that Powelson's actions caused him emotional distress, that her actions affected the way he did his work, and that he had to take precautions about being in his office after dark. On the facts of this case, severe emotional distress was established by Haverbush's testimony (1) that Powelson's letter accused him of harassment, (2) that he was especially fearful after Powelson left the ax and the hatchet on his vehicles,

(3) that Powelson's letters caused him great concern that she was going to interfere with his wedding, (4) that he was worried about his reputation because of what Powelson said about him to others, (5) that he was concerned with his patients' safety, and (6) that Powelson's actions affected the way he did his work.

II

Powelson next asserts that the trial court erred in denying her motion for a directed verdict and later motion for a judgment notwithstanding the verdict (JNOV). We find no error.

Powelson argues that although the trial court mentioned the need to prove "outrageous" conduct, it failed to properly state that this element of the tort is actually "*extreme* and outrageous conduct." However, in granting judgment for Haverbush, the trial court stated that plaintiff had proved the type of conduct that would cause a reasonable person upon seeing or hearing of that conduct to shout, "outrageous, unbelievable!" In light of the evidence of Powelson's conduct previously set forth, we find no merit to defendant's argument.

Powelson also argues that the trial court erroneously denied her motions, because the court incorrectly applied a "reasonableness" standard, rather than one of intent or recklessness. See *Roberts v Auto-Owners Ins Co, supra* at 602 (second element). This argument is without merit. The trial court specifically stated that the conduct had to be "made for the purpose of" inflicting emotional distress (which is consistent with intent) or that "any reasonable person would know that emotional distress would result." Saying that "any reasonable person would know emo-

tional distress would result" is similar to saying that the conduct is reckless. The trial court did not err in concluding that any reasonable person in Powelson's position would know that emotional distress would result from her actions; on the facts of this case, this is sufficient to show recklessness.

Finally, the court did not err in concluding that there was sufficient evidence of severe emotional distress to deny the motions. As stated previously, Powelson's pattern of escalating conduct would cause reasonable persons to fear for their own safety and to be distraught and emotionally harmed. The trial court therefore properly denied Powelson's motions for a directed verdict and a JNOV.

III

Powelson next argues that the trial court erred in granting an injunction. According to Powelson, Haverbush had an adequate remedy at law (in the form of the peace bond statute and the stalking law) and had not suffered irreparable injury. According to *Peninsula Sanitation, Inc v Manistique*, 208 Mich App 34, 43; 526 NW2d 607 (1994), there are three prerequisites to obtaining injunctive relief:

> (1) justice must require that the court grant the injunction, (2) there must be no adequate remedy at law, and (3) there must be a real and imminent danger of irreparable injury.

The existence of criminal or economic penalties is not an adequate remedy at law if it requires a party to return to the courts repeatedly. *Id.* In light of the overwhelming evidence of Powelson's actions over nearly three years to harass and inflict distress and

fear in Haverbush, the trial court did not err in concluding that Haverbush had no adequate remedy because the remedies proposed by Powelson here would require him to return to the police or the courts repeatedly.

Powelson also argues that the injunction was improperly granted because there was no threat of imminent harm, all incidents having ceased when the lawsuit was filed. This overlooks the fact that a temporary restraining order was signed by the court on June 8, 1992, one month after the suit was filed. The fact that Powelson previously had failed to cease her inappropriate contacts with Haverbush when requested both by him and by his attorney also supports the conclusion that an injunction was an appropriate remedy.

IV

In its judgment and order, the trial court ordered Powelson to apply for a lateral transfer within the hospital to an alternative position of equal or equivalent duties, compensation, and benefits, so as to avoid to the greatest extent possible any contact between the parties and between Powelson and Haverbush's patients. Powelson argues that the trial court's order requiring her to apply for a transfer to a different position is ineffectual, is fraught with enforcement problems, fails to prevent the type of harm allegedly suffered, and impairs her occupation and livelihood.

At trial, it was established that ninety percent of Haverbush's patients are on floor 2F of the hospital. Plaintiff said that he had brought the lawsuit to the hospital's attention because he thought that it was

possible that Powelson might try to harm one of his patients in an effort to retaliate. After the lawsuit was filed, Powelson was temporarily transferred away from 2F, but she returned there sometime later.

It is not clear why Powelson believes that being ordered to seek a lateral transfer will be ineffectual. If such a transfer takes place, it will minimize contact between Powelson and Haverbush and Haverbush's patients. This is precisely the effect sought by the court. Defendant also claims that this portion of the order fails to prevent the type of harm allegedly suffered. However, the injunction is intended to minimize contact between Haverbush and Powelson, which was one of the harms suffered. It is intended to protect Haverbush's patients, a concern which was justified in light of Powelson's bizarre behavior. Defendant's concern about enforcement problems is also ill-founded; all the injunction requires her to do is to *apply*. If a lateral position is not available or does not exist, she will have complied with the order merely by applying. Finally, Powelson's claim that this portion of the injunction impairs her occupation has no support in the record. In fact, because she was previously transferred away from floor 2F, there is no reason to believe that she cannot be a nurse on other floors of the hospital. Given plaintiff's testimony and Powelson's inappropriate and obsessive behavior, the court was justified in ordering Powelson to apply for a lateral transfer.

V

Powelson finally argues that the trial court erred in awarding damages in the amount of Haverbush's

attorneys' fees plus ten percent (a total of $11,615). We disagree.

Haverbush testified that Powelson's action had cost him money, mainly in attorney fees. He testified that (to that point in the trial) his attorneys fees were about $7,500. He also paid Powelson's attorney to attend a meeting. He had hired two deputies to provide security for his wedding at the church and at his home. He also testified that, with respect to damages, he was only looking for a symbolic amount and that it was not his intention to inflict serious financial harm upon Powelson, who is a single mother.

After finding that an intentional infliction of emotional distress claim had been established, the trial court noted that there is no accurate way to place a dollar figure on what plaintiff's monetary damages had been. The court thus held that it would award Haverbush his actual attorney fees plus ten percent. His counsel subsequently submitted a bill of costs, to which Powelson's counsel objected. The court reduced slightly the amount claimed and entered an order awarding $11,615.

Powelson argues that the court did nothing more than award Haverbush his attorney fees, contrary to the general rule that each party has to bear its own attorney fees. We disagree. Given the testimony about Powelson's escalating outrageous actions, the trial court would have been justified in awarding more than $11,615 in damages for emotional distress. However, because Haverbush testified that he was not seeking to inflict serious financial harm on Powelson, the court decided to award him an amount equal to his attorney fees plus ten percent. No factfinder can value pain and suffering (or here, mental distress

damages) with mathematical certainty. *Precopio v Detroit*, 415 Mich 457, 470-471; 330 NW2d 802 (1982). However, courts frequently look to comparable awards in similar cases to evaluate whether a particular award exceeds the range demonstrated by the evidence. *Id.* at 471-473. In *Dickerson, supra* at 104, this Court affirmed an award of $16,500 in an action for intentional infliction of emotional distress that was similar to this case (long-term harassment, parties worked at the same place, false accusations). The trial court's damage award was not clearly erroneous.

VI

We deny Haverbush's request for sanctions on appeal pursuant to MCR 7.216(C). Although we find no merit to the issues raised on appeal, the matter was not so lacking in merit as to be vexatious.

Affirmed.