RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

RICHARD WEBSTER,

　　　　　　*Plaintiff-Appellant,*

　　　*v.*

UNITED AUTO WORKERS, LOCAL 51,
INTERNATIONAL UNITED AUTO WORKERS, ARTHUR
BIANCHI, NATHANIEL MARTIN, GIL WOJCIK,
ROSALYN GRANT, HOLLY WAINGROW, WILLIAM
MICHAEL KIRKSEY, ILLIE WILLIAMS, ROBERT LEE
MITCHELL, JAMES MOORE, STEPHEN YOKICH,
MAURICE MITCHELL, STAN GEIS, PETE CUTWAY,
NATE GOODWIN, and EUNICE STOKES, jointly and
severally,

　　　　　　*Defendants-Appellees.*

No. 03-2601

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-74983—Victoria A. Roberts, District Judge.

Submitted: December 9, 2004

Decided and Filed: January 12, 2005

Before: KENNEDY, MARTIN, and MOORE, Circuit Judges.

———————

## COUNSEL

**ON BRIEF:** Benjamin Whitfield, Jr., Cynthia J. Gaither, BENJAMIN WHITFIELD, JR. &
ASSOCIATES, Detroit, Michigan, for Appellant. Roger J. McClow, William J. Karges, KLIMIST,
McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, Laura J. Campbell,
ASSOCIATE GENERAL COUNSEL INTERNATIONAL UNION, UAW, Detroit, Michigan, for
Appellees.

———————

## OPINION

———————

　　　BOYCE F. MARTIN, JR., Circuit Judge. Richard Webster brought this action against
United Auto Workers, elected officials of Local 51, and International United Auto Workers and

1

some of its elected officials alleging (1) violation, by constructive discharge, of the Labor Management Reporting and Disclosure Act, (2) injurious falsehood, (3) intentional infliction of emotional distress, and (4) continuing acts of defamation and retaliation. The district court granted defendants' motion for summary judgment and Webster timely appealed. We AFFIRM, because Webster offers no proof to create a genuine issue of material fact.

I.

Webster began working for Chrysler Corporation in 1964. From 1974 to at least September 2002, he held full-time elected union positions in which he represented plant employees and performed contract administration duties. During negotiations for the 1997 Local 51 Settlement Agreement with Chrysler, Webster learned that Local 51 management had agreed silently to end propshaft production at the Mound Road Engine Plant. Because the agreement would have resulted in the loss of several hundred jobs at the plant, Webster refused to sign it. A twenty-eight day strike followed. In responding to questions from the media, Webster stated that International Auto Workers had "sold out" the membership. Webster alleges that as a result of his opposition he became the target of "reprisals, rejection, humiliation, slander, libel, deprivation, [and] ostracization from all named Defendants."

Webster argues that we should consider the following facts as continuing acts of reprisal against him. In May, Local 51 held elections for positions at the Mound Road Engine Plant. Webster won re-election as the Matching Division Committeeman. The election results were contested by Darryl Mitchell, not a party to this case, who alleged misconduct by Webster's challenger. The union assigned defendant Eunice Stokes to investigate. She overturned the election results and ordered a re-run election, in which Mitchell would run against Webster. Webster won the second election.

In November, Webster noticed that an employee, defendant Michael Kirksey, received lost-time pay for which he was not eligible according to Local 51 bylaws and the United Auto Workers Constitution. Webster disputed the pay and defendant Stan Geis, the Administrative Assistant to the Secretary-Treasurer, investigated the alleged impropriety, although he had no authority to do so. Geis determined that Kirksey committed no impropriety. Kirksey then sued Webster in June 1999 for defamation. As evidence of the falsehood of Webster's accusations, Kirksey submitted a letter of exoneration from Geis.

In 1999, Webster and certain defendants sat on Local 51's bargaining committee. In August, they began negotiations with Chrysler for the Local Collective Bargaining Agreement. A settlement was reached in October and a vote for ratification was scheduled. Volumes of literature were distributed, by Webster among others, in favor of and against the agreement. Webster acknowledges distributing documents "informing the membership of the bargaining committee's responsibility to go back to the bargaining table after the no-vote on the local agreement." Defendants present evidence that Webster distributed to Local 51 members "marching orders" to "[g]o out there and disrupt, excite, and whip the rank and file up over any and every issue so that we can prevent the [agreement] from being ratified." The membership did not ratify the agreement. A second vote for ratification was scheduled.

In the meantime, the bargaining committee distributed its own literature seeking support of the agreement and criticizing Webster. For example, the committee distributed a series of documents containing satirical question-and-answer conversations with Webster. One was entitled "A Candid Conversation with Sir Richard of Webster." Webster claims that these documents were not written to garner support for the agreement, but rather to portray him as a liar. He claims that defendants were "bombarding the general membership with negative literature, posters, flyers, [and] cartoons about [him]." He demanded an apology from the committee; in response, the committee

distributed literature entitled, "So Richard You Want An Apology," which, Webster says, apologized to Local 51 members for not "taking him out" sooner.

On the second vote, the membership ratified the agreement. Subsequently, Webster filed several internal charges against the local officials relating to the allegations made in this action, and alleging violations of the United Auto Workers Ethical Procedures Code. The charges were dismissed by the union's Executive Board, which was composed of named defendants.

Webster appealed that decision to Local 51, raising these three issues: (1) the cancellation of a meeting in which Local 51 management was to consider Webster's allegations, (2) the failure of Local 51's Executive Board to notify Webster of its decision to dismiss his charges, and (3) the intervention of Local 51's Executive Board to block Webster's charges. The appeal was denied. Webster contends that local and national union management deliberately ignored his charges and dismissed them with no explanation. He states that he "finally succumbed to defendants' conduct and suffered emotional illness and early unplanned retirement."

In December 1999, Webster's doctor advised him to take sick leave. Webster refused, and ultimately began to abuse alcohol. By December 15 he was not able to work; his doctor prescribed medication and a therapy program. On December 31 he retired from Chrysler and, pursuant to the National Agreement, he was required to relinquish his union position. However, he remained chairman of the bylaws committee until September 2001.

Simultaneous with his retirement, Webster brought this action. The district court dismissed each of Webster's claims on summary judgment, and Webster timely appealed.

II.

We examine an appeal of a summary judgment utilizing the standard of review employed by the district court. *Qualicare-Walsh, Inc. v. Ward*, 947 F.2d 823, 825 (6th Cir. 1991). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

III.

1.     Labor Management Reporting and Disclosure Act

The Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2), secures the right of every member of any labor organization to

> meet and assemble freely with other members; and to express any views, arguments, or opinions and to express at meetings of the labor organization his views upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility or every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Section 411(a)(5) prohibits a union from fining, suspending, expelling, or "otherwise disciplin[ing]" any of its members for exercising rights secured under the Act. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 90 (1989). Webster, who concedes that he was "not officially discharged or suspended," argues that he was "disciplined" in violation of the Act by

the local and international union. Webster alleges that the discipline he received was the unions' "concerted activity to disparage [him] to the membership and to deny him the right to challenge this concerted activity within the context of a union hearing." As to this claim, the district court determined that Webster failed to allege facts to show that he was "disciplined" in violation of the Act.

We agree that Webster fails to show that defendants "disciplined" him. The Supreme Court has concluded "that by using the phrase 'otherwise disciplined,' Congress did not intend to include all acts that deterred the exercise of rights protected under the [Act], but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Breininger*, 493 U.S. at 91; *accord United Food and Commercial Workers v. United Food and Commercial Workers Int'l Union*, 301 F.3d 468, 473 (6th Cir. 2002). According to the *Breininger* Court, as a general rule, a union member is "disciplined" when the union takes action "'under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'" 493 U.S. at 91 (quoting *Miller v. Holden*, 535 F.2d 912, 915 (5th Cir. 1976)). It described such discipline as punishments typically imposed by the union as an entity through established procedures meant to signify penalties applied by the union in its official capacity, "rather than ad hoc retaliation by individual union officers." *Id*. at 92, n.15.

In light of this description, we have measured allegations of discipline by how closely they resembled ad hoc retaliation by individual union officials or, in contrast, punishment authorized by a collective entity to enforce its rules. *United Food,* 301 F.3d at 473-74. In *United Food*, we concluded that the alleged discipline—which basically constituted a reassignment of union members to an area outside of the union's jurisdiction—represented the kind of ad hoc retaliation not governed by the Act. We also found it significant that the alleged punishment in that case did not result from an established union disciplinary process. *Id*. (citation omitted). In making this decision, we looked to the Seventh Circuit's holding in *Konen v. International Brotherhood of Teamsters, Local 200*, 255 F.3d 402, 410 (7th Cir. 2001), that a plaintiff was not "disciplined" in violation of the Act because he was "never subjected to official Union discipline . . . and there [was] no evidence that his membership rights or status [had] been diminished in any way."

We apply this reasoning to conclude that Webster failed to show evidence of "discipline" as it is defined by the Act. Even assuming that Webster did retire and that he could satisfy some of the elements of constructive discharge, he presents no evidence to show that the alleged treatment of him was authorized by a collective entity to enforce its rules or that it resulted from an established union disciplinary process. As presented by Webster, he was the target of the kind of ad hoc retaliation by individual union officials that is not subject to the protections of the Act.

Webster's argument to the contrary, based on the Seventh Circuit's decision in *Kinslow v. American Postal Workers Union, Chicago Local*, 222 F.3d 269 (7th Cir. 2000), is not persuasive. In that case, the Seventh Circuit affirmed a district court's finding that the Postal Workers Union unlawfully retaliated against plaintiff Kinslow, who had brought to its attention certain criminal acts by the union president. *Id*. at 272. The union disparaged Kinslow to other union members, ignored his complaints of improper treatment, expelled him from the union, and refused to reinstate him after his allegations against the president were revealed to be true. *Id*. at 272-73, 279. The district court correctly found that *Kinslow* was not applicable because the plaintiff in that case was actually expelled from the union, and Webster was not.

2.          Injurious Falsehoods

Second, Webster claims that defendants committed injurious falsehood in violation of Michigan law by distributing cartoons and other publications that portrayed him as a "liar." In Michigan, a defendant commits an injurious falsehood if it publishes a false statement either with knowledge of its falsity or "in reckless disregard of its truth or falsity." *Kollenberg v. Ramirez*, 339 N.W.2d 176, 179 (Mich. Ct. App. 1983); *accord Falls v. Sporting News Publ'g Co.*, 834 F.2d 611, 617 (6th Cir. 1987). Recovery for injurious falsehood is appropriate where there has been "some interference with an economically advantageous relationship which results in pecuniary loss." *Kollenberg*, 339 N.W.2d at 177-79. In order to establish a prima facie case of injurious falsehood, a plaintiff must show: (1) that the defendant published a false statement to a third party knowing that statement to be false or acting in reckless disregard for its truth or falsity; (2) that the defendant knew, or should have known, that this false publication would likely result in pecuniary loss or in harm to the interests of the plaintiff having a pecuniary value; and (3) that the plaintiff suffered special damages as a result. *Neshewat v. Salem*, 173 F.3d 357, 364 (6th Cir. 1999) (citing *Kollenberg*, 339 N.W.2d at 179).

Without analyzing the district court's conclusion regarding Webster's pleading of special damages, we affirm the court's dismissal of this claim because Webster fails to present evidence to support the elements of the claim. In their motion to dismiss, defendants argued that Webster failed to produce any evidence that defendants published any false statements or that they knew or should have known that any false statements would likely result in pecuniary loss or in harm to any interest of Webster's having pecuniary value. In response to defendants' motion, Webster stated only that he properly alleged the elements of the claim. He provided absolutely no evidence to support any element of the claim. There is simply nothing in the record to show that defendants knew or had reason to know that their statements were false, that defendants knew or should have known that their statements would likely result in any pecuniary loss, or that Webster suffered any special damages as a result. Webster's claim for injurious falsehood fails on summary judgment. For that reason, the claim is properly dismissed.

3.          Intentional Infliction of Emotional Distress

Third, Webster claims intentional infliction of emotional distress. Under Michigan law, the elements of a claim of intentional infliction of emotional distress are (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999) (citing *Haverbush v. Powelson*, 555 N.W.2d 206 (Mich. Ct. App. 1996)). In ruling on such a claim, "it is initially for the [trial] court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995) (citing *Sawabini v. Desenberg*, 372 N.W.2d 559 (Mich. Ct. App. 1985)). However, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) of Torts §46 cmt. h (1965)*; see also Linebaugh v. Sheraton Mich. Corp.*, 497 N.W.2d 585, 588-89 (Mich. Ct. App. 1993) (noting that whether conduct is sufficiently outrageous and extreme to render one liable for the intentional infliction of emotional distress is a matter for determination by the trier of fact). Here, the trial court properly concluded that Webster failed to allege any facts on which a reasonable person would find extreme or outrageous conduct.

Extreme or outrageous conduct is that which goes beyond the bounds of decency and would be considered atrocious and utterly intolerable in civilized society. *Johnson v. Wayne County*, 540 N.W.2d 66, 74 (Mich. Ct. App. 1995); *see also Margita v. Diamond Mortgage Corp.*, 406 N.W.2d 268, 271 (Mich. Ct. App. 1987) (stating that liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities). As evidence of extreme or

outrageous conduct, Webster identifies defendant Kirksey's suit against him for defamation, defendants' refusal to process his allegations of impropriety against certain defendants, and defendant Yokich's alleged warning to Webster's co-workers to "disassociate from plaintiff" because "he was going to 'gut' plaintiff." Webster claims that these instances constitute outrageous and extreme conduct that forced him to retire, and, at the very least, reasonable minds could differ as to whether defendants' conduct was extreme or outrageous.

In support, Webster relies on the case of *Haverbush*, 551 N.W.2d 206, for the proposition that simply because he contends that certain alleged facts represent extreme and outrageous conduct a grant of summary judgment is precluded. In response, the district court stated that where alleged conduct does not rise to the level of conduct that is extreme or outrageous, summary judgment is appropriate. The district court recognized, moreover, that the decision in *Haverbush* was limited to its particular facts, which undoubtedly would lead reasonable minds to find the extreme and outrageous conduct absent here. In *Haverbush*, 551 N.W.2d 209-10, defendant

> (1) sent a barrage of letters to Haverbush, to his daughter, and to his future in-laws, in which she called him a compulsive liar, threatened his fiancée with physical harm, and threatened to tell his colleagues that he had harassed [her]; (2) left lingerie on Haverbush's vehicles and at his residence several times; (3) left an ax and a hatchet on his vehicles, after having asked him how his fiancee would like to have an ex through her windshield; (4) told a co-worker several times that someone should "ice" Haverbush; and (5) wrote several letters threatening to move in with him even though he was engaged and would soon be married.

Webster fails to allege conduct that rises to this extreme degree. Webster was subject only to the kinds of insults and indignities that Michigan courts have determined are not properly the bases for a claim of intentional infliction of emotional distress. *See Margita*, 406 N.W.2d at 271. The district court properly dismissed the claim.

4.     Continuing Retaliation and Defamation

Finally, Webster claims continuing acts of defamation and retaliation. The district court properly found that Webster presented no evidence to show that defendants continued to publish or distribute the cartoons and other publications of which Webster complains. Also, because Webster cannot show that defendants' conduct constituted defamation or retaliation in any way, any claim that such acts are "continuing" is without merit.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment.