# STATE OF MICHIGAN

# COURT OF APPEALS

JUSTIN MATTESON and CALLIE MATTESON
individually and as next friend for SABRINA
MATTESON, NICHOLAS MATTESON, and
ALYSSA MATTESON,

        Plaintiffs-Appellees,

v

YOU WALK BAIL BOND AGENCY, INC., and
CHRISTOPHER SLUPKA,

        Defendants,
and

AARON HODGESON,

        Defendant-Appellant.

UNPUBLISHED
October 17, 2017

No. 332345
Oakland Circuit Court
LC No. 2015-145252-NO

Before: GLEICHER, P.J., and HOOD and SWARTZLE, JJ.

PER CURIAM.

Following a bench trial, the circuit court found defendant Aaron Hodgeson liable to plaintiffs for his role in a botched bounty hunt and assessed damages totaling $30,000. Hodgeson challenges the evidentiary support for the trial court's verdict. We affirm.

## I. PROCEDURAL BACKGROUND

Defendant Hodgeson and Christopher Slupka worked for You Walk Bail Bond Agency, Inc. The agency sought a red-headed absconder named Justin Dallencourt. Defendants misidentified red-headed plaintiff Justin Matteson as Dallencourt. They entered the Mattesons' home, handcuffed Justin Matteson in the presence of his wife and children, and searched the entire premises. After discovering that Justin was not a wanted man, defendants departed. The Mattesons called the police. White Lake Township charged the bondsmen with various misdemeanors. Slupka pleaded guilty and testified against Hodgeson, who was acquitted.

Matteson and his family then filed this civil suit against the bondsmen and You Walk, alleging defamation, battery, intentional infliction of emotional distress, false arrest and imprisonment, invasion of privacy, tortious interference with a business relationship, trespass,

-1-

and violation of their constitutional right to be free from unreasonable search and seizure. In an amended complaint, plaintiffs added claims of negligent supervision and respondeat superior against the bail bond agency. Slupka and the agency did not respond and the court entered default judgments against them. Slupka was held liable for $120,835.79. The agency was held liable for $100,000.

## II. BENCH TRIAL TESTIMONY

On December 15, 2014, defendants Aaron Hodgeson and Christopher Slupka worked as bail bond agents for defendant You Walk Bail Bond Agency. While searching for Dallencourt, they were directed to Mike Tuminelli, a friend of the absconder. Tuminelli told defendants "that the only red head Justin [he knew was] Mr. Matteson." Tuminelli described that the absconder would be found in "the first house on the right that was yellow." He also described the car used by the absconder and gave his physical description.

Defendants arrived in the neighborhood of Justin and Callie Matteson in Slupka's Jeep at approximately 7:40 p.m. About an hour later, they spoke to plaintiffs' neighbor. The bondsmen showed the neighbor a photograph of Justin Dallencourt and the man "said that that looks like Justin that lives over there in the yellow house, again confirming the same house that Mike Tuminelli did." According to Hodgeson, the photograph was a "tangible photo," not an electronic image, and was "fuzzy" and "grainy."

Between 9:10 and 9:15 p.m., Justin Matteson returned home from work. Hodgeson observed Justin park his car and go into the home. After observing Callie watching from the home's picture window, Hodgeson waved, prompting Slupka to pull into the driveway and block Justin's vehicle. Slupka testified that Hodgeson had been working at the agency longer than he and acted in a supervisory role that night. Hodgeson denied that he was ever a "supervisor" during his employment.

Hodgeson inspected Justin's parked vehicle while Slupka approached the home alone. Hodgeson first ran a record check on the license plate, but it "came back no record." Hodgeson then attempted to run a record check on the vehicle's VIN number, but he was unable to complete it.

Slupka testified, contrary to Hodgeson, that he waited to approach the home's door until Hodgeson could follow. Slupka "knocked on the door, told him we're fugitive recovery. Asked him if he was Justin. Open the door. Turn around." Slupka denied pushing open the door and asserted that plaintiffs granted defendants permission to enter. Hodgeson described that while he was still at Justin's car, Slupka "was doing a lot of yelling, pounding on the door." Slupka entered the home alone, according to Hodgeson, and had already cuffed Justin before Hodgeson arrived at the door. Hodgeson subsequently claimed that he asked Callie whether the men could enter to "sort this all out" and she agreed.

Slupka admitted that he placed Justin in handcuffs and then "turned him over to Mr. Hodgeson." Hodgeson "detain[ed]" Justin, meaning that he stood "next to him" and ensured that he did not run away or hurt anyone. Slupka then searched the home. Slupka indicated that Justin

was handcuffed for approximately 10 minutes. Afterward, Slupka apologized and described plaintiffs as "very understanding of the whole situation."

Hodgeson asserted that he inspected Justin's driver's license and Callie voluntarily provided hers. As defendants gathered "more information," they determined that Justin Matteson was not Justin Dallencourt. Slupka then removed Justin's handcuffs. Hodgeson provided a business card to plaintiffs as they left. And according to Hodgeson, Justin "shook our hand" and said, "thank you for what you do."

Justin testified that when he arrived home on the night in question, he "noticed a suspicious vehicle parked" in the driveway of a vacant home across the street. Justin was in the house for about 10 minutes, changing and getting ready to shower after work, when his wife reported that someone was "looking at our vehicle." Justin looked out the window and saw a white Jeep speed into the driveway, blocking his car. "Moments later [he] heard pounding on the door . . . saying Justin, open the door, you're under arrest and you're going to jail." Justin "unlatched the door" and defendants pushed it open, entering without permission. "They had black shirts, khaki pants, guns, tasers. They had gear that would suspect them [sic] of being a SWAT member." Justin thought defendants were police officers.

Slupka cuffed Justin's hands behind his back. Defendants "interrogate[d]" him, asking him questions about his parents, his vehicles, and his children. Defendants wanted to know the names of Justin's parents and where they lived. Justin inquired why defendants were in his home and they responded "that they were looking for a Justin with red hair and he was wanted for multiple offenses, including possession of narcotics, failure to appear and driving on a suspended license." Justin realized "they had the wrong guy" and "offered to show them identification." Callie showed defendants both her and Justin's driver's licenses, but defendants did not remove the cuffs. Slupka searched their home while Justin remained in handcuffs in Hodgeson's custody.[1] Justin described that Hodgeson "presented himself as being confident that he had the right person that he was in search of. And he wasn't taking no for an answer, that I was the correct person that he was looking for" despite that Justin denied being the suspect "[c]ountless times." When Slupka finally removed Justin's cuffs, Justin "shook their hand and thanks [sic] that they weren't taking me to jail." Justin believed he had remained in cuffs "[f]or at least 45 minutes."

Callie testified that after Justin returned home, she "looked out the dining room window and . . . saw two men dressed in all black, scoping the house out. And I thought we were about to be robbed. So I told my husband, I think we're about to be robbed." She observed Slupka park his Jeep to "block[] our car in the driveway." "[T]hen they both ran up onto our porch and all we heard was pounding on the door and they said, Justin, open the door, we have a warrant for your arrest." Only 30 seconds elapsed between Callie's first observation of the men and their arrival at her door. Justin "unlatched the door and they pushed it open, came in and pushed him

---

[1] Hodgeson insisted that Justin testified at the criminal trial that he was not handcuffed during the search. Hodgeson did not offer the transcript of his criminal trial for admission during the civil bench trial.

against the wall and arrested him in front of me and my daughter." Slupka was the first to enter and he placed Justin in handcuffs. Justin asked about the charges against him and one of the men "listed [them] off."

Plaintiffs advised defendants that Justin had never been in trouble with the law and that his last name was not Dallencourt. Callie produced their driver's licenses. Hodgeson showed plaintiffs a "very clear" color picture on "a very big iPad." The picture "[l]ooked nothing like Justin. . . . The only . . . similarity was the red hair and that wasn't even really that much of a telltale sign because [Justin Matteson] shaves his hair most of the time." The suspect wore glasses while Justin Matteson did not. When Callie pointed out the dissimilarities, defendants said, "I'm sorry, we believed that you went to extents to change your identity. We believe . . . you're the right person." Defendants "were not going to take no for an answer."

Callie indicated that Hodgeson questioned her and Justin while Justin remained handcuffed. Callie asserted that Hodgeson advised that they had been watching the Matteson home for three days and asked about vehicles that had been parked at the home during that timeframe. Hodgeson denied that he had been to the neighborhood before the night in question or that he had asked Callie these specific questions. Callie "asked if there was anything else that could be done so they wouldn't take [Justin] to jail and then they asked if they could search." Callie agreed. Slupka searched every room in the house, waking up her sleeping son. While Slupka searched, Hodgeson "stepped over and grabbed Justin's arm and stood there with him the whole time. . . ." Ultimately, Callie believed that Justin was handcuffed for 30 to 40 minutes. Callie described that "it seemed like a joke to" defendants, "[t]hey were laughing." When defendants apologized, they said, "Oh, sorry, I guess we have the wrong person. Like this is a joke now."

Callie lost a paying babysitting job as a result of this incident. She had been watching a friend's three-year-old daughter five days a week, nine hours a day, for the prior two years. Callie earned approximately $400 each month from this job. Callie noted on cross-examination that the little girl she babysat was also in the living room during this incident. The child's grandmother came to collect her while defendants were still at the home, and the child's mother stopped employing Callie thereafter.

Plaintiffs' five-year-old daughter was present during these events. "She was scared" and crying. She is now afraid of police officers and asks whenever she sees one if her father is going to go to jail. The "ordeal" left Justin "Upset. Upset, angry, scared." Callie is "very uncomfortable," "uncomfortable being home alone most times. Because you never know when someone is watching." Callie further noted that at the time of the incident, her father was dying. As a result of the stress, she forgot many small details of the incident.

Plaintiffs called 911 after defendants left. White Lake Township police officer Gregory Gondek responded, arriving at plaintiffs' home at approximately 10 p.m. Gondek interviewed Hodgeson by telephone and he outlined his investigation process. Hodgeson described that Dallencourt's mother directed him to Tuminelli, who in turn directed him to Justin Matteson's home. Gondek testified that Hodgeson conceded that defendants had conducted surveillance at plaintiffs' home for several days but "were unable to ascertain whether Mr. Matteson was the subject in question" because he had only "a fuzzy photograph" of the bail absconder. Hodgeson

denied this claim. Hodgeson described the bounty hunters' interactions with Justin Matteson to Gondek as consensual and appropriate. Gondek indicated that Hodgeson's version of events conflicted with that of plaintiffs. They reported that two armed men claiming to be bail bond agents "pound[ed] on the front door," "forced their way in," and immediately "turned [Justin] around and handcuffed him."

Hodgeson took the stand and explained why he and Slupka continued to investigate after Justin Matteson asserted his innocence. During his tenure with You Walk, Hodgeson averaged 30 to 40 arrests each month. He experienced several arrests where the person falsely denied being the suspect, and others where the individual was truthful. "The proper protocol" when a bounty hunter is uncertain about the person's identity, Hodgeson asserted, does not include handcuffing the individual. And Hodgeson claimed he would have stopped Slupka from handcuffing Justin, but he was not there at that moment.

Following plaintiffs' case in chief, defense counsel moved for a directed verdict. The court directed a verdict of no cause of action on plaintiffs' counts of tortious interference with a business relationship, invasion of privacy, and defamation. The court deemed abandoned plaintiffs' battery claim as counsel did not address this count at trial. At the close of trial, the court found Hodgeson liable for trespass, but noted that plaintiffs suffered only nominal damages as a result. The court found Hodgeson liable to Justin for false imprisonment and awarded him $10,000 in damages. The court also found Hodgeson liable of intentional infliction of emotional distress against both Justin and Callie and awarded each $10,000 in damages.

## III. ANALYSIS

Hodgeson complains that the trial court could not find him liable for false imprisonment and intentional infliction of emotional distress because any acts that satisfied these torts were actually committed by Slupka, and not him. Following a bench trial, we review the court's factual findings for clear error and its legal conclusions de novo. *Flint v Chrisdom Props, Ltd*, 283 Mich App 494, 498; 770 NW2d 888 (2009).

A civil defendant can be held jointly liable for essentially aiding and abetting a tort. In *Brink v Purnell*, 162 Mich 147, 149; 127 NW 322 (1910), two individuals physically assaulted the plaintiff at a park. Evidence established that Benjamin Purnell stood by "and shouted repeatedly: 'Kill him! Kill him! We have got him now! Kill him!' " *Id*. The Supreme Court approved the circuit court's charge to the jury that Purnell could be held equally liable for assault if "you find that he counseled, instigated, aided, and abetted in the assault upon the plaintiff." *Id*. (quotation marks and citation omitted).

Hodgeson relies upon *Dorsey v Barber*, 517 F3d 389, 399 n 4 (CA 6, 2008), citing *Ghandi v Detroit Police Dep't*, 747 F2d 338, 352 (CA 6, 1984), for the proposition that a defendant cannot be held civilly liable on an aiding and abetting theory. However, *Dorsey* and *Ghandi* involved federal claims under 42 USC 1983. The question of each defendant police officer's liability had to be separately resolved because whether he or she was entitled to qualified immunity was based on each individual officer's subjective "good faith." This case was brought under state law. No police officers were involved. Qualified immunity and its good-faith exception are not applicable here.

And the evidence presented at trial amply sufficed to support the trial court's judgment that Hodgeson participated in both falsely imprisoning Justin and intentionally inflicting emotional distress. Plaintiffs' proofs established that Hodgeson and Slupka acted pursuant to a common design. Under longstanding Michigan common-law precedent, they may be held liable under a concert of action theory. *Abel v Eli Lilly & Co*, 418 Mich 311, 338; 343 NW2d 164 (1983). In a civil trial, the plaintiff need only convince the fact finder of the defendant's liability by a preponderance of the evidence. *Reed v Burton*, 475 Mich 531, 541; 718 NW2d 770 (2006). It is the province of the fact finder to assess witness credibility and weigh the evidence and we will not interfere with the court's judgment in this regard. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), mod 441 Mich 1201 (1992); *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

As described by this Court in *Walsh v Taylor*, 263 Mich App 618, 627; 689 NW2d 506 (2004):

> False imprisonment . . . involves an unlawful restraint on a person's liberty or freedom of movement. The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement. The restraint must have occurred without probable cause to support it. [Quotation marks and citations omitted.]

This Court has defined the probable cause element of a false imprisonment and arrest claim as follows:

> Probable cause that a particular person has committed a crime "is established by a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that the accused is guilty of the offense . . . ." *People v Coutu*, 235 Mich App 695, 708; 599 NW2d 556 (1999), quoting *People v Tower*, 215 Mich App 318, 320; 544 NW2d 752 (1996). Probable cause is not capable of being precisely defined, but rather, it is a commonsense concept dealing with practical considerations of everyday life that must be viewed from the perspective of reasonable and prudent persons, not legal technicians. *Ornelas v United States*, 517 US 690, 695-696; 116 S Ct 1657; 134 L Ed 2d 911 (1996). [*Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 19; 672 NW2d 351 (2003).]

After considering the conflicting testimony of the various witnesses, the trial court found that Justin had been handcuffed for 30 to 45 minutes. Although Slupka was the person who placed Justin in handcuffs, the court noted that Hodgeson "made no attempts to remove the handcuffs even though he had the ability to do so." Indeed, Hodgeson had complete control over Justin while Slupka searched the house and according to all witnesses, made no effort to remove Justin's restraints. Further, the evidence supported that Hodgeson and Slupka acted in concert in invading the home and restraining Justin. Justin was clearly conscious of his confinement as he was awake and alert during the entire incident.

The trial court found that the confinement was made without probable cause as "there is no evidence in this record to support that [Justin] had committed any crimes." The court cited Hodgeson's admission at trial that defendants "had 'the wrong guy' and 'the wrong house.'" The circuit court did not properly analyze this final element of the false imprisonment count. Hodgeson testified that after interrogating Justin and Callie and inspecting Justin's driver's license, he realized that Justin Matteson was not Justin Dallencourt. Whether probable cause existed to place Justin in handcuffs cannot be judged based on evidence gathered after the fact. See *Brewer v Perrin*, 132 Mich App 520, 527; 349 NW2d 198 (1983) ("Probable cause to arrest is determined by whether or not the 'facts available to the police at the moment of arrest would have justified a fair-minded person of average intelligence and judgment in believing that [the arrestee] had committed a felony.'"); *Dixon v Shiner*, 12 Mich App 573, 584; 163 NW2d 481 (1967) (holding that to overcome a false arrest claim, there must be probable cause "at the time of the arrest").

The trial court's error does not require reversal, however. The court accepted Callie's testimony that Hodgeson produced an electronic color photograph of Jason Dallencourt and that Justin Matteson did not resemble the bail absconder. Upon viewing Justin Matteson close up, defendants should have been able to determine that he was not the man in the photograph. This realization should have come before Slupka placed Justin in handcuffs. Even if Hodgeson was not present when Slupka first entered and cuffed Justin, Hodgeson was certainly able to intervene and remove the cuffs, or at least urge Slupka after reviewing the photograph that a mistake had been made. Accordingly, the record evidence supports that defendants lacked probable cause when they encountered and handcuffed Justin. There is no ground to overturn the $10,000 award to Justin in this regard.

Hodgeson also challenges the trial court's determination that he intentionally inflicted emotional distress on plaintiffs. Under Michigan law, a plaintiff must establish four elements to prove a claim of intentional infliction of emotional distress: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 602; 374 NW2d 905 (1985) (quotation marks and citation omitted).

Hodgeson focuses his appellate challenge on the element of "severe emotional distress." The Supreme Court defined "severe emotional distress" in *Roberts*, 422 Mich at 608-609:

> The Restatement commentary explains the emotional distress requirement as follows:
>
> > The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the*

*distress inflicted is so severe that no reasonable man could be expected to endure it.* [Restatement Torts, 2d, § 46, comment j, p 77. Emphasis added.]

Further, although bodily injury need not result, the Restatement commentary suggests that "more in the way of outrage" may be required where a claim is based on emotional injury alone. *Id*., comment k, p 78.

We additionally find instructive the definitions given by other courts in interpreting this element:

The "severe emotional distress" required to support a cause of action for intentional infliction of emotional distress was discussed by the Supreme Court of Illinois in *Knierim v Izzo*, 22 Ill 2d 73, [85;] 174 NE2d 157 (1961):

". . . not . . . every emotional upset should constitute the basis of an action. Indiscriminate allowance of actions for mental anguish would encourage neurotic overreactions to trivial hurts, and the law should aim to toughen the psyche of the citizen rather than pamper it. But a line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." . . .

In *Fletcher v Western [Nat'l] Life Ins Co*, 10 Cal App 3d 376, 397[;] 89 Cal Rptr 78 (1970), "severe emotional distress" was defined as "emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." [*Harris v Jones*, 281 Md 560, 571-572; 380 A2d 611 (1977).]

Consistent with the California Court of Appeals' formulation, this Court has held, "The intensity and the duration of the distress are factors to be considered in determining its severity." *Dickerson v Nichols*, 161 Mich App 103, 107; 409 NW2d 741 (1986). While the distress must rise to a high level to create liability, the victim is not required to seek medical treatment to support relief. *Haverbush v Powelson*, 217 Mich App 228, 235; 551 NW2d 206 (1996).

In finding that plaintiffs had suffered severe emotional distress, the trial court cited Justin's testimony that "he was upset, angry, and scared." The court further noted evidence that Callie is "angry" and "is uncomfortable being home alone and worries that someone is 'watching.'" The court went on to reject the Mattesons' daughter's claim to damages as she was not present at trial to establish her claimed emotional distress. However, the trial court found that her parents "are affected by the fact that their child now becomes concerned that Mr. Matteson will be arrested whenever she sees a police officer."

We discern no error in the trial court's conclusion that Justin suffered severe emotional distress. Justin rightfully felt "[u]pset, angry, [and] scared;" he was unlawfully handcuffed by armed men who forced their way into his home after dark while his wife and children were present, thoroughly searched his home, and awakened his youngest child in the process. Justin was also impacted by the effect of his child's ongoing distress. Justin testified, "Every time she sees a cop . . . she notices that that is a police officer and asks . . . if I'm going to go to jail."

Although counsel could have more deeply developed this testimony, the trial court observed Justin on the stand and was able to personally gauge his level of emotional distress. We will not interfere with the trial court's assessment.

Plaintiffs presented more detailed evidence of the distress experienced by Callie. Justin described, "She feels uncomfortable being home alone most times. Because you never know when someone is watching." Callie asserted, "[Defendants] told us that they had been watching our house for three days. Which made me very uncomfortable." When she saw defendants approaching her home, "dressed in all black, scoping the house out," she "thought [they] were about to be robbed." Callie expressed a higher level of distress than her husband over the trauma to her oldest daughter:

> *Q.* . . . [H]ave you been appointed next friend for your daughter [S]?
>
> *A.* Yes.
>
> *Q.* . . . [W]hat was her reaction?
>
> *A.* She was scared. She - - she truly believed that they were police officers. She didn't know the difference. And she didn't understand what was happening. You know, I don't think she's ever seen anything like that.
>
> I - - I really want my kids to believe that law enforcement and police officers are good people. They're there to help you, that you can call if you need help. And because of this, my daughter truly is fearful of police. She thinks that they're always going to be arresting someone. She think[s] that's what a police officer does, that's it, they arrest people. That's a problem for me.
>
> *Q.* . . . [W]hy isn't [S] here to testify today?
>
> *A.* Because I - - this was traumatic enough as it was for her. I did not - - I made it clear from the beginning that I would never want to bring her into court and have her be questioned and have her relive this. I - - I don't even talk to her about it anymore because I don't want to continuously bring it up in her mind. [Tr, pp 93-94.]

Callie's distress was exacerbated because her father was on his deathbed at the time:

> I actually never said this in court before, because it's been really hard to deal with. While this happened my dad was dying of cancer and my dad actually passed away six days after this happened. I have been dealing with a lot with my family. This has been just a huge inconvenience to deal with at the same time, but it's important that they don't go around thinking this is okay.
>
> Little, tiny details I might have forgotten because my father had just died.

Considered as a whole, the record evidence supports that Callie experienced severe emotional distress as a result of defendants' actions.

However, Hodgeson insists that plaintiffs failed to establish the remaining elements of their intentional infliction of emotional distress claim. "Extreme and outrageous" conduct was defined by the Supreme Court in *Roberts*, 422 Mich at 602-603, quoting Restatement Torts, 2d, § 46, cmt d, pp 72-73:

> An oft-quoted Restatement comment summarizes the prevailing view of what constitutes "extreme and outrageous" conduct:

> > The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The trial court did not err in finding that Hodgeson crossed the line of acceptability into the zone of outrageousness. Hodgeson, along with Slupka, came to plaintiffs' home well after dark, dressed all in black and carrying weapons. Defendants pushed their way into plaintiffs' home, where their three children and another young child were present, and immediately placed Justin into handcuffs in front of his crying five-year-old daughter. Despite having a picture from which defendants should have been able to determine that Matteson was not Dallencourt, defendants asked a series of probing, personal questions and disregarded Justin's state-issued driver's license. Defendants bullied plaintiffs into allowing them to search the premises. Hodgeson physically held Justin in place while Slupka searched every room, waking a sleeping toddler in the process. The encounter was lengthy—30 to 45 minutes—despite the ever rising evidence that defendants had ambushed the wrong home. The trial court did not err in concluding that Hodgeson's conduct was extreme and outrageous.

Record evidence also supported the trial court's conclusion that Hodgeson was reckless. The court's determination that Hodgeson was reckless is closely related to its finding that defendants did not have probable cause to arrest or imprison Justin.

> Even if Defendant's testimony that he received a "tip" that Dhallecourt [sic] was located inside Plaintiffs' home from Tuminelli and from Plaintiffs' neighbor, that would still not be sufficient to justify entering the home without permission. Further, Mr. Matteson was handcuffed before he was asked questions to determine whether he was in fact Dhallecourt [sic]; although the record establishes that Slupka handcuffed Mr. Matteson, the record is also clear that Defendant made no attempts to remove the handcuffs. Rather, despite Mr. and Mrs. Matteson's "countless" statements that Mr. Matteson was not Dhallecourt [sic] and Mrs. Matteson producing identification, Defendant "would not take 'no'

-10-

for an answer." Importantly, Mrs. Matteson testified that Defendant was in possession of a color photograph at the time he was in the home; Mrs. Matteson testified that, aside from the fact that Dhallecourt [sic] and Mr. Matteson both have red hair, they do not look alike. The Court notes that Defendant testified that he ultimately located Dhallecourt [sic] in Wyandotte, where the bond paperwork indicated he was residing. The Court finds that Defendant's actions on December 15, 2014 establish that he was "utterly unconcerned about the consequences" of his actions and the impact it would have on Mr. and Mrs. Matteson.

We discern no error in the court's reasoning or its factual determination that Hodgeson acted recklessly. Given the record evidence, the trial court properly and reasonably held Hodgeson liable to plaintiffs on this count.

We affirm.


/s/ Elizabeth L. Gleicher
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle